UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------

VICTOR CHACON,                          :
     Plaintiff,                        :        3:02CV1016 (CFD)
                                            :
     -against-                         :
                                            :        February 25, 2004

ECHO BAY MARINA, INC.                   :
     Defendant.                        :

------------------------------------------------------------

APPENDIX TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT CONTAINING COPY OF DEFENDANT'S MEMBERSHIP
AGREEMENTS; EXCERPTS OF DEPOSITION TRANCRIPTS OF MARK VOELTZ,
MARC ROGG, AND MICHAEL D'ANTONA

Dated: Bridgeport, Connecticut
       February 25, 2004

THE HAYMOND LAW FIRM
Attorneys for the Plaintiff,
Victor Chacon
1000 Lafayette Boulevard
Suite 210
Bridgeport, CT, 06604
(203) 330-6757
(203) 330-6762 (fax)

ORAL ARGUMENT REQUESTED
TESTIMONY NOT REQUIRED

# DEFENDANT'S MEMBERSHIP AGREEMENT



227 Candlewood Lake Rd
Brookfield, CT 06804
Tel: (203) 775-7077
Fax: (203) 775-8809                    DATE SIGNED UP: _____11/13/99_____
Website: www.echobaymarina.com

## I. Owner Information

NAME(S) OF OWNER(S): _Mark Voeltz_
ADDRESS: (street) _485 Commerce St._
(city) _Hawthorne_ (state) _NY_ (zip) _10532._
TELEPHONE: (home) _(914) 769-6807_ (work) _(914) 769-6234_

## II. Boat Information

MAKE: _Chaparrel_ LENGTH: _____

TYPE: B/R _____ Cuddy _✓_ Cruiser _____ Pontoon _____ Bass Boat _____
Center Console _____ Deck Boat _____ Jet Boat _____ PWC _____

YEAR: _1995_ COLOR(S): _____
REGISTERED IN:  CT _____ NY _____ OTHER _____

## III. Storage Options

SLIP #: _224_ TRAILER STORAGE: (YES) _____ (NO) _✓_
SLIP TYPE:
Single Berth _✓_ Premium Double _____
Electricity _____

## IV. Payment Information

| | | |
|---|---|---|
| SLIP TOTAL: | $ _1600.00_ | (CHK# 1311  $300.00  Balance |
| TRAILER STORAGE: | $ | 11-15-99  @ 1000.00 |
| SHORE POWER: | $ | Cash  $500.0  Bal  600.0 |
| DOCK BOX RENTAL: | $ | 6-25-00 |
| SUBTOTAL 1: | $ | Pd Cash 8.500 @ 300.00  Bal $ 300.0 |
| 11/1/98 DISCOUNT: | $ -- | (Only if applicable) Pd. Cash 8/20/00 $300.00  Pd. in fu |
| SUBTOTAL 2: | $ | |
| SALES TAX: | $ | |
| **TOTAL DUE:** | $ _1600.00_ | |
| PAYMENT 1: | $ _300.00_ | Form of Payment: _CK # 1307_ Date: _11/8/99_ |
| **BALANCE DUE:** | $ _1,300.00_ | |
| 4/15/99 DISCOUNT: | $ -- | (Only if applicable) |
| PAYMENT 2 **Due in full:** | $ . | Form of Payment: _____ Date: _____ |

*Note: _____

_____

Customer Signature: _[signature]_
Contract Approved By: _[signature]_

PLAINTIFF'S
EXHIBIT
1
8/25/03 Voelz

## Terms of Storage Agreement

1. Storage agreement shall apply solely to the vessel the Owner identified on the other side of this document and Owner may not assign, sublease or transfer this agreement to any other person or vessel, nor shall Owner exchange with any other Owner, such storage space as designated by Lessor.

2. The Marina reserves the right to deny any person docking privileges at any time, and also to remove said person's vessel from Marina if necessary upon five (5) days notice with refund of only that part of fees paid by applicant for time which has not been used.

3. The rates specified in this agreement are solely for the storage of the type indicated and do not include any repairs, winterization, recomissioning, covering, uncovering, blocking or cleaning work.

4. All vessels must be removed from the Marina on or before the specified end of the season. Vessels left in the Marina after that date are subject to hauling and winterizing and/or winter storage charges at owner's expense.

5. No outside mechanical work shall be performed on engines and/or components, fuel systems, and related electrical and wiring systems at the Marina. If Owner wishes to perform mechanical work on his/her vessel, the Owner must haul the vessel or move it to open water.

6. Outside contractors, workers and/or establishments can not perform work on any vessel within the Marina boundaries.

7. Owner agrees that Lessor may take such actions and complete such emergency repairs as may become necessary to save and protect the vessel from damage or destruction without Owner's knowledge or consent, but at Owner's expense. Owner agrees to reimburse Lessor for such emergency repairs and service at Lessor's normal contract rate.

8. No person other than the Owner wishes to perform mechanical work on his/her immediate family or person in company with the Owner will be allowed aboard the vessel while in storage, unless Owner notifies Lessor and gives consent for such other persons to board the vessel.

9. Owner shall at all times keep his/her vessel and storage space clean and free of debris or any conditions that may be dangerous to the health, safety, or well-being of any person. No flammable or hazardous substances may be kept in or around storage area or on the vessel, and any condition in or around the vessel which constitutes a fire hazard, heal menace, or nuisance shall be corrected immediately by the Owner.

10. All storage shall be at the sole risk of the Owner and Owner shall at all times maintain liability and casualty insurance coverage on the vessel, property therein, and activities in connection therewith. Lessor shall not be liable for and is hereby released by Owner for all claims of damage or loss to the vessel or Owner due to fire, theft, collision, or other casualty to persons or property caused by the negligence of Owner or conditions or use of the vessel.

11. Owner shall comply with all laws, ordinances, rules and regulations of the State of Connecticut that may pertain to the dockage, storage or operation of the vessel, and such regulation as Lessor may introduce from time to time. Any violations shall be corrected by Owner.

12. All storage charges and charges for services, supplies, and repairs and materials shall be paid prior to departure of the vessel from Lessor. Lessor shall have a lien upon the vessel, its contents, and equipment, wherever such vessel may be located, for any storage, repair, or service charge not paid.

13. No advertising or For Sale signs are permitted on any vessel or motor. Should Owner wish to sell his/her vessel, the Marina offers an active brokerage service. Outside agents, brokers, dealers, or otherwise are not permitted to conduct sale efforts on Marina property.

14. All bills are due within thirty (30) days. No vessel shall be launched until all bills are paid in full. If vessel shall be launched the same day as the bill is paid or if request is made to remove the vessel from the yard the same day as the bill is paid, such payment shall be made by cash or certified check only. If a personal check is submitted, launching or removal shall take place only when bank verification has been obtained that the check has cleared.

15. All statements must be paid within thirty (30) days of the stated due date. The customer will be responsible for late charges at the rate of 2.00% per month on the amount outstanding, plus any additional costs of collection, including attorney's fees.

16. The Marina reserves the right to move any person's vessel at any time if it becomes necessary in regards to space, lack of payment, or problems with the size of the Owner's vessel.

## General Rules

1. All vessels are to be operated under the speed limits established by law within the Marina area.

2. Pets must be on leash at all times.

3. Vehicles' belonging to the Owner, members of the Owner's family, guests, and Marina employees, shall be parked in the parking area in such a manner so as to comply with the parking rules and regulations as established, so emergency vehicles have ready access. Any vehicles blocking emergency access area, loading zones, or the ramp and driveways will be towed at the Owner's expense. No trailers are allowed in the lakeside parking lot. Vehicles without appropriate permits are subject to tow at Owner's expense.

4. No person shall discharge oil, spirits, waste, flammable liquid or oily bilges from their vessels.

5. All vessels tied at the slips must use bow, stern, and spring lines. Those who do not will be responsible for the damage they cause. The use of insufficient or worn dock lines is strictly forbidden and management may replace all such lines with suitable dock lines at their discretion, the cost of which shall be paid by the Renter.

6. Noise shall be kept to a minimum at all times so as not to disturb or annoy, cause discomfort or inconvenience to other persons using the Marina, especially between the hours of 9:00pm and 8:00am.

7. Any type of littering is prohibited. All refuse shall be placed in the appropriate receptacles.

8. Trailers left on the property are subject to storage charge. Trailers must be secured by the owner to prevent loss. Tongue locks oar other devices deigned to prevent theft must be installed. Trailer must also have Owner's name clearly and permanently marked on the tongue for easy identification. Lessor is not responsible for theft damage to trailers left on the premises.

9. IT IS UNDERSTOOD BY THE VESSEL OWNER THAT LESSOR WILL NOT BE RESPONSIBLE OR LIABLE FOR ANY DAMAGE OR LOSS TO THE VESSEL, ITS GEAR OR ANY EQUIPMENT DUE TO THEFT OR OTHERWISE, AND DOES NOT CARRY ANY INSURANCE TO COVER SAME. VESSELS STORED OUTDOORS OR IN THE WATER ARE STORED AT CUSTOMER'S OWN RISK.

The conditions of this agreement shall be perpetuated for as long as the owner continues keeping his/her boat at the Lessor's facility.



ECHO BAY MARINA

227 Candlewood Lake Rd
Brookfield, CT 06804
Tel: (203) 775-7077
Fax: (203) 775-8809
Website: www.echobaymarina.com

*LM 1022*

# 1999-2000 Winterization and Winter Storage Contract

*For Dave Boehig*   *10/15/99*
*maybe sooner*

Date: *9/12/99*

Name(s): *Mark Voeltz*
Address: *485 Commerce St*   Town *Hawthorne*   State *N.Y.*   Zip Code: *10532*
Slip #(if applic.): *234*   Key location: _____   Phone #(s): Home *(914) 769-6807*  Work *(914) 769-6234*
Boat Make: *Chapparelle*   Length: *23'*   Engine Type: *V-8*
Trailer: ☐Yes:   ☐No: _____   Location: _____

**Winter Storage Agreement is effective starting October 1, 1999 and ends June 1, 2000.**

| WINTER STORAGE OPTIONS | | LABOR | MATERIALS | INITIAL AND DATE |
|---|---|---|---|---|
| • Outdoor 28 ft. max. Storage (Shrink Wrap Required) | $15.00/ft | | 0 | JH 1/10/21 |
| • Shrink Wrap Std. Width Boats (Incl. No-Damps) | $9.00/ft incl. mat'ls | 207.00 | 0 | / |
| ⇒ Pontoon Boats  (Incl. No-Damps) | $10.00/ft. incl. matl | | 0 | / |
| ⇒ Cruiser Style Boats (Incl.No.Damps) | $12.00/ft. incl. matls. | | 0 | / |
| * Flybridge / over 20' wide shrink  priced upon request. | | | | |
| • No trailer handling fee (Applies in Spring & Fall). | | | | |
| ⇒ Pontoon Boats: | $ 30.00 | | 0 | / |
| ⇒ Runabouts: | $ 50.00 | | 0 | / |
| ⇒ Cruisers (23 ft. end up) | $120.00 | | 0 | / |

| WINTERIZATION SERVICES | | | | |
|---|---|---|---|---|
| Cleaning and Pick up | | | | |
| Acid and Power Wash Fiberglass Bottoms | $ 5.50/ft incl. mat'ls | 126.50 | 0 | / |
| • Pressure Wash Pontoons | $ 3.00/ft | | 0 | / |
| • Pick up on  Candlewood Lake | No charge | | 0 | / |
| • Pick up on land ($50.00 min.) | $ 60.00/hour | | 0 | / |
| Winterize Inboard or I/O Engines: | | | | |
| ⇒ V6 & V8 Engines | $125.00 + mat'ls | 125.00 | 45.59 | 0 / |
| ⇒ Inline 4 & 6 Cylinder Engines | $ 95.00 + mat'ls | | | 0 / |
| • Change Oil, Oil Filter, Fuel Filter | $ 50.00 + mat'ls | 50.00 | 31.25 | 0 / |
| • Change Outdrive Oil (I/O 's) | $ 35.00 + mat'ls | 35.00 | 18.36 | 0 / |
| Service Outdrive: Mercruiser and OMC: | $ 90.00 + mat'ls | | | 0 / |
| Winterize Outboard: Mounted on Boat: | $ 90.00 + mat'ls | | | 0 / |
| • Change Lower Unit Oil (OB's) | $ 35.00 + mat'ls | | | 0 / |
| Recondition Prop: | | | | |
| • Aluminum | $ 75.00 | | | 0 / |
| • Repair damaged skeg | $ 200.00 | | | 0 / |
| Additional Winterizing Services (Cruisers) | | | | |
| • Winterize Head | $ 95.00 incl.mat'ls | | | 0 / |
| • Winterize Fresh Water System | $140.00 incl. mat'ls | | | 0 / |
| 2000 Spring Recommission: | | | | |
| • Start & Check-out / Launch Test drive: | $ 105.00 | | | 0 / |
| • Deliver to dock on the lake: | $ 40.00 | | | 0 / |
| • Shrink wrap disposal | $ 25.00 | | | 0 / |

Notes: _____

| | |
|---|---|
| **Total Labor:** | 543.50 |
| **Sales Tax on Labor:** | |
| **Total Parts/Materials:** | 95.20 |
| **Sales Tax on Parts:** | 5.72 |
| **Storage:** | |
| **Gas:** | |
| **Early Haul out discount:** | |
| **Total:** | 644.42 |

PLAINTIFF'S
EXHIBIT
_____
1/31/03 RVG

*#invoice 5291*
*10-22-99*

## STORAGE AGREEMENT AND TERMS

LESSEE agrees to remove the units described above at the termination of this rental agreement. Boats not removed by this date shall, at the option of the LESSOR, be charged rent on a daily basis of $5.00 per day for each day or portion thereof the space is occupied. In the event non-removal of the boat or rig presents a hazard to other persons or property, or interferes with normal business operations, LESSOR shall reserve the right to move the boat or rig to another location AT LESSEE'S RISK and LESSEE AGREES TO PAY ALL COSTS INVOLVED IN THE REMOVAL OF SAID BOAT OR RIG.

☐LESSEE authorizes LESSOR to remove boat from storage upon termination of this rental agreement and place boat in wet storage solely at LESSEE'S ¡
☐LESSEE authorizes LESSOR to remove the above described units from storage and transport to_____

IT IS UNDERSTOOD AND AGREED THAT TRANSPORT OF THE UNITS DESCRIBED SHALL BE ENTIRELY AT THE LESSEE'S RISK.
THIS SPACE LEASE AGREEMENT IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1. INSURANCE: THE LESSOR DOES NOT CARRY INSURANCE COVERING THE PROPERTY OF THE LESSEE. THE LESSOR WILL NOT BE RESPONSIBLE FOR ANY INJURIES OR PROPERTY DAMAGE RESULTING, CAUSED BY, OR GROWING OUT OF THE USE OF THE FACILITIES OF LESSOR AND LESSEE DOES HEREBY RELEASE AND DISCHARGE THE LESSOR FROM ANY AND ALL LIABILITY FROM LOSS, INJURY (INCLUDING DEATH), OR FOR DAMAGES TO PERSON OR PROPERTY SUSTAINED WHILE IN OR ON THE PREMISES OF LESSOR, INCLUDING FIRE, THEFT, VANDALISM, WINDSTORM, HIGH OR LOW WATERS, HAIL, RAIN, ICE, COLLISIONS OR ACCIDENT OR ANY OTHER ACT OF GOD.

2. NON-ASSIGNMENT OF SPACE: It is agreed between LESSOR and LESSEE that LESSEE shall not assign, transfer, or permit the use of assigned space to any other party without the express written consent of LESSOR.

3. ELIMINATION OF HAZARDOUS MATERIALS: Cooking, smoking or the use of any open flame is prohibited inside or outside of the boat while in the storage area. All non-permanent gas tanks, containers of liquid or gaseous fuels, solvents, flares, matches or any other flammable materials must be removed before placement in storage. No combustible or dangerous materials will be allowed to collect in or around the boat at any time. The LESSEE further agrees to keep storage area free and clear of all tackle, gear and other obstructions. FIRE EXTINGUISHERS IN GOOD WORKING ORDER MUST BE ON BOARD.

4. SURVEY AND INSPECTION: The LESSEE authorizes LESSOR to thoroughly survey the boat for fire hazards at hauling or prior to moving to storage. LESSEE understands that this regulation is formulated, enforced and conducted solely for the protection of LESSOR. The promulgation and enforcement of these rules and regulations, the conducting of a survey, the failure to require or fully perform a survey with respect to other LESSEE(S) will not subject LESSOR to any duty or liability to the LESSEE with respect to fire or explosion prevention or detection. In general, any survey will be solely at the discretion of the LESSOR.

5. REMOVAL OF PERSONAL PROPERTY: The LESSEE should remove any personal property from boat prior to storage. IT IS UNDERSTOOD AND AGREED THAT LESSOR WILL NOT BE RESPONSIBLE FOR ANY ITEMS OR PERSONAL PROPERTY LEFT IN BOAT.

6. PROTECTIVE COVERING: The LESSEE assumes full responsibility for providing adequate covering to protect boat from any and all perils, and for the proper maintenance of such covering while the boat is on or in the premises of LESSOR.

7. ALL SPACE RENTALS ARE PAYABLE IN ADVANCE: It is understood and agreed that no boat is to be removed from its space unless all charges space rental and/or late charges have been paid in full.

8. If LESSEE becomes delinquent in rental payments, the LESSEE being properly notified of such delinquency as may be required by law, the LESSOR shall have the right to take over the property of the LESSEE and to secure the property to the space occupied, or store it at another location.
LESSEE AGREES THAT IN THE EVENT SUIT IS BROUGHT ON BEHALF OF THE LESSOR AGAINST THE LESSEE TO COLLECT ANY AMOUNTS DUE OR TO BECOME DUE THEREUNDER, OR TO ENFORCE LESSOR'S LIEN ON THE PROPERTY OF LESSEE, THE LESSEE SHALL PAY THE LESSOR'S REASONABLE ATTORNEY FEES FOR SUCH SUIT OR COLLECTION PLUS COSTS, AS PROVIDED BY LAW, OR TO TAKE ANY OTHER REMEDIES AVAILABLE UNDER THE LAW.

9. Should any term or condition of this Space Rental Agreement be held void or unenforceable, then that term shall be deemed severed from this Agreement and the enforceability of the remainder shall not be affected and will remain in full force and effect.

10. RULES AND REGULATIONS: The rules and regulations contained herein and as posted in the office or on the grounds by LESSOR are for the safety and welfare of all who use the facilities. It is further understood and agreed that at all times while the boat is stored, the LESSEE and/or their guests shall become subject to all rules and regulations formulated by LESSOR. LESSEE agrees that all duly posted rules and regulations are reasonable, that LESSEE has read and understands said rules and regulations, and further assumes the responsibility to see that his guests will obey the rules.

11. Any infraction of the rules and regulations contained herein or as posted in the office shall, at the option of the LESSOR, cancel this space rental agreement upon proper notice to LESSEE, and the LESSEE shall remove his boat or rig from the premises.

12. The LESSOR shall not be held responsible for delays in hauling, winter layup, commissioning or launching due to bad weather or for any other reasons beyond its control.

13. ENTIRE AGREEMENT: This agreement contains the entire understanding between the LESSEE and LESSOR and no other representation or inducement, verbal or written, has been made which not contained in this agreement.
SPECIAL TERMS AND CONDITIONS (if any)_____
_____

IT IS AGREED THAT THIS CONTRACT IS PERFORMABLE AND VENUE SHALL BE IN FAIRFIELD COUNTY, STATE OF CONNECTICUT. ALL NOTICES REQUIRED BY THIS LEASE OR AT LAW SHALL BE TO THE ADDRESSES STATED HEREIN.
LESSEE'S CERTIFY THAT THE PRINTED MATTER ON BOTH FRONT AND BACK OF THIS AGREEMENT HAS BEEN READ AND THE TERMS AND CONDITIONS SET FORTH HEREIN ARE FULLY UNDERSTOOD. LESSEE(S) FURTHER CERTIFY THAT THEY HAVE EXAMINED THE SPACE WHICH THE SUBJECT BOAT IS TO BE PLACED AND FIND IT SUITABLE AND ACCEPTABLE.
I (WE) ACKNOWLEDGE A COPY OF THIS AGREEMENT.
Lessor: Echo Bay Marina  By_____
Lessee:_____



227 Candlewood Lake Rd
Brookfield, CT 06804
203-775-7077

**ECHO BAY MARINA**



PLAINTIFF'S
EXHIBIT

DATE SIGNED UP: _11-2-97_____

## I. Owner Information

NAME(S) OF OWNER(S): _Mark   Voeltz_____
ADDRESS: (street) _485   Commerce st·_____
(city) _Hawthorne_____ (state) _NY_ (zip) _10532_
TELEPHONE: (home) _914-769-6807_ (work) _014-769-6234_

## II. Boat Information

MAKE: _Chapparall_____     LENGTH: _23'_____

TYPE: B/R _____ Cuddy _____ ✓Cruiser_____ Pontoon_____ Bass Boat_____
Center Console_____ Deck Boat_____ Jet Boat_____ PWC_____

YEAR: _1995_____ COLOR(S): _____
REGISTERED IN: CT _____ NY _____ OTHER _____

## III. Storage Options

SLIP #: _224_____     TRAILER STORAGE: (YES)    ⟨(NO)⟩
SLIP TYPE:
Single Berth_____ ✓Premium Double_____ Standard Double_____

## IV. Payment Information

| | | |
|---|---|---|
| SLIP TOTAL: | $ 1500.00 | Pd. $300.00   2-1-99 #3650 |
| TRAILER STORAGE: | $ | Bal. $1200.00 |
| SHORE POWER: | $ | Pd. $200.00   Bal. $1000.00 |
| DOCK BOX RENTAL: | $ | Pd. $200.00  Balance. $800.00   7-11-9 |
| SUBTOTAL: | $ | CAR |
| 11/1/97 DISCOUNT: | $ -- | (Only if applicable)  Pd. $300.00  Bal. $500.0 |
| SALES TAX: | $ | 03-28 |
| TOTAL DUE: | $ 1500.00 | 9/12/99  Pd. $200.00  Bal. $300. |
| PAYMENT 1: | $ | Form: _10/16/9_ Date: $300.00  (Pd in full) |
| BALANCE DUE: | $ | |
| 4/15/98 DISCOUNT: | $ -- | (Only if applicable) |
| PAYMENT 2 Due in full: | $ | Form: _____ Date: _____ |

*Note: _____

_____
_____
_____ )

Customer Signature: _[signature]_____
Contract Approved By: _[signature]_____

## Terms of Storage Agreement

1. Storage agreement shall apply solely to the vessel the Owner identified on the other side of this document and Owner may not assign, sublease or transfer this agreement to any other person or vessel, nor shall Owner exchange with any other Owner, such storage space as designated by Lessor.

2. The Marina reserves the right to deny any person docking privileges at any time, and also to remove said person's vessel from Marina if necessary upon five (5) days notice with refund of only that part of fees paid by applicant for time which has not been used.

3. The rates specified in this agreement are solely for the storage of the type indicated and do not include any repairs, winterization, recomissioning, covering, uncovering, blocking or cleaning work.

4. All vessels must be removed from the Marina on or before the specified end of the season. Vessels left in the Marina after that date are subject to hauling and winterizing and/or winter storage charges at owner's expense.

5. No outside mechanical work shall be performed on engines and/or components, fuel systems, and related electrical and wiring systems at the Marina. If Owner wishes to perform mechanical work on his/her vessel, the Owner must haul the vessel or move it to open water.

6. Outside contractors, workers and/or establishments can not perform work on any vessel within the Marina boundaries.

7. Owner agrees that Lessor may take such actions and complete such emergency repairs as may become necessary to save and protect the vessel from damage or destruction without Owner's knowledge or consent, but at Owner's expense. Owner agrees to reimburse Lessor for such emergency repairs and service at Lessor's normal contract rate.

8. No person other than the Owner wishes to perform mechanical work on his/her immediate family or person in company with the Owner will be allowed aboard the vessel while in storage, unless Owner notifies Lessor and gives consent for such other persons to board the vessel.

9. Owner shall at all times keep his/her vessel and storage space clean and free of debris or any conditions that may be dangerous to the health, safety, or well-being of any person. No flammable or hazardous substances may be kept in or around storage area or on the vessel, and any condition in or around the vessel which constitutes a fire hazard, heal menace, or nuisance shall be corrected immediately by the Owner.

10. All storage shall be at the sole risk of the Owner and Owner shall at all times maintain liability and casualty insurance coverage on the vessel, property therein, and activities in connection therewith. Lessor shall not be liable for and is hereby released by Owner for all claims of damage or loss to the vessel or Owner due to fire, theft, collision, or other casualty to persons or property caused by the negligence of Owner or conditions or use of the vessel.

11. Owner shall comply with all laws, ordinances, rules and regulations of the State of Connecticut that may pertain to the dockage, storage or operation of the vessel, and such regulation as Lessor may introduce from time to time. Any violations shall be corrected by Owner.

12. All storage charges and charges for services, supplies, and repairs and materials shall be paid prior to departure of the vessel from Lessor. Lessor shall have a lien upon the vessel, its contents, and equipment, wherever such vessel may be located, for any storage, repair, or service charge not paid.

13. No advertising or For Sale signs are permitted on any vessel or motor. Should Owner wish to sell his/her vessel, the Marina offers an active brokerage service. Outside agents, brokers, dealers, or otherwise are not permitted to conduct sale efforts on Marina property.

14. All bills are due within thirty (30) days. No vessel shall be launched until all bills are paid in full. If vessel shall be launched the same day as the bill is paid or if request is made to remove the vessel from the yard the same day as the bill is paid, such payment shall be made by cash or certified check only. If a personal check is submitted, launching or removal shall take place only when bank verification has been obtained that the check has cleared.

15. All statements must be paid within thirty (30) days of the stated due date. The customer will be responsible for late charges at the rate of 2.00% per month on the amount outstanding, plus any additional costs of collection, including attorney's fees.

16. The Marina reserves the right to move any person's vessel at any time if it becomes necessary in regards to space, lack of payment, or problems with the size of the Owner's vessel.

## General Rules

1. All vessels are to be operated under the speed limits established by law within the Marina area.

2. Pets must be on leash at all times.

3. Vehicles' belonging to the Owner, members of the Owner's family, guests, and Marina employees, shall be parked in the parking area in such a manner so as to comply with the parking rules and regulations as established, so emergency vehicles have ready access. Any vehicles blocking emergency access area, loading zones, or the ramp and driveways will be towed at the Owner's expense. No trailers are allowed in the lakeside parking lot. Vehicles without appropriate permits are subject to tow at Owner's expense.

4. No person shall discharge oil, spirits, waste, flammable liquid or oily bilges from their vessels.

5. All vessels tied at the slips must use bow, stern, and spring lines. Those who do not will be responsible for the damage they cause. The use of insufficient or worn dock lines is strictly forbidden and management may replace all such lines with suitable dock lines at their discretion, the cost of which shall be paid by the Renter.

6. Noise shall be kept to a minimum at all times so as not to disturb or annoy, cause discomfort or inconvenience to other persons using the Marina, especially between the hours of 9:00pm and 9:00am.

7. Any type of littering is prohibited. All refuse shall be placed in the appropriate receptacles.

8. Trailers left on the property are subject to storage charge. Trailers must be secured by the owner to prevent loss. Tongue locks oar other devices deigned to prevent theft must be installed. Trailer must also have Owner's name clearly and permanently marked on the tongue for easy identification. Lessor is not responsible for theft damage to trailers left on the premises.

9. IT IS UNDERSTOOD BY THE VESSEL OWNER THAT LESSOR WILL NOT BE RESPONSIBLE OR LIABLE FOR ANY DAMAGE OR LOSS TO THE VESSEL, ITS GEAR OR ANY EQUIPMENT DUE TO THEFT OR OTHERWISE, AND DOES NOT CARRY ANY INSURANCE TO COVER SAME. VESSELS STORED OUTDOORS OR IN THE WATER ARE STORED AT CUSTOMER'S OWN RISK.

The conditions of this agreement shall be perpetuated for as long as the owner continues keeping his/her boat at the Lessor's facility.



227 Candlewood Lake Rd
Brookfield, CT 06804
Tel: (203) 775-7077
Fax: (203) 775-8809
Website: www.echobaymarina.com

# 2000-2001 Winterization and Winter Storage Contract

First available pick up date: _Mid-October_

Contract Date: _9|8|00_

Name(s): _Voeltz, Mark_
Address: ....................
Slip #(if applic.): ..........      Town ........................
Boat Make: _Chaparral_            Key location: ..................
Trailer: (Yes:) ..........          Length: _23'_
                                    No: ...........

State ..........................      Zip Code: ..........
Phone #(s): Home: _V-8_            Work: ..........
Engine Type: _V-8_
Location: ..........................

Winter Storage Agreement is effective starting October 1, 2000 and ends June 1, 2001.

## WINTER STORAGE OPTIONS

|  | LABOR | MATERIALS | INITIAL AND DATE |
|---|---|---|---|
| Outdoor 28 ft. max. Storage (Shrink Wrap Required) $16.00/ft | ___ | 0 ___ / ___ | ___ / ___ |
| Shrink Wrap/Slip Wdth. Boats (Incl No Damps) $16.00/ft. incl.mat'ls. | ___ | 0 ___ / ___ | ___ / ___ |
| ⇒ Pontoon Boats (Incl. No-Damps) $10.00/ft. incl.mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| ⇒ Cruiser Style Boats (Incl.No.Damps) $13.00/ft. incl.mat'ls. | ___ | 0 ___ / ___ | ___ / ___ |

* Flybridge / over 20' wide shrink  priced upon request.

- No trailer handling fee (Applies in Spring & Fall).

| | | | |
|---|---|---|---|
| ⇒ Pontoon Boats: $30.00 | ___ | 0 ___ / ___ | ___ / ___ |
| ⇒ Runabouts: $50.00 | ___ | 0 ___ / ___ | ___ / ___ |
| ⇒ Cruisers (23 ft. and up) $120.00 | ___ | 0 ___ / ___ | ___ / ___ |

## WINTERIZATION SERVICES

### Cleaning and Pick up

| | | | |
|---|---|---|---|
| Acid and Power Wash Fiberglass Bottoms: $3.00/ft incl.mat'ls. | ___ | 0 ___ / ___ | ___ / ___ |
| • Pressure Wash Pontoons $ 4.50/ft | ___ | 0 ___ / ___ | ___ / ___ |
| • Pick up on  Candlewood Lake No charge | ___ | 0 ___ / ___ | ___ / ___ |
| • Pick up / Deliver on land ($35.00 min.) $ 70.00/hour | ___ | - 0 ___ / ___ | ___ / ___ |
| • Haul / Block off site (pontoon & runabouts) $ 40.00 | ___ | 0 ___ / ___ | ___ / ___ |

### Winterize Inboard or I/O Engines:

| | | | |
|---|---|---|---|
| ⇒ V6 & V8 Engines $125.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| ⇒ Inline 4 & 6 Cylinder Engines $ 95.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| Change Oil, Oil Filter, Fuel Filter $50.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| Change Outdrive Oil (I/O's) $ 50.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |

### Service Outdrive: Mercruiser and OMC:
### Winterize Outboard: Mounted on Boat:

| | | | |
|---|---|---|---|
| $ 115.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| $ 90.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| • Change Lower Unit Oil (OB's) $ 35.00 + mat'ls | ___ | 0 ___ / ___ | ___ / ___ |

### Recondition Prop:

| | | | |
|---|---|---|---|
| • Aluminum $ 73.00 | ___ | 0 ___ / ___ | ___ / ___ |
| • Repair damaged skeg $ 200.00 | ___ | 0 ___ / ___ | ___ / ___ |

### Additional Winterizing Services (Cruisers)

| | | | |
|---|---|---|---|
| • Winterize Head $ 95.00 incl mat'ls | ___ | 0 ___ / ___ | ___ / ___ |
| • Winterize Fresh Water System $140.00 incl. mat'ls | ___ | 0 ___ / ___ | ___ / ___ |

### 2001 Spring Recommission:

| | | | |
|---|---|---|---|
| • Start & Check-out / Launch Test drive: $ 105.00 | ___ | . 0 ___ / ___ | ___ / ___ |
| • Deliver to dock on the lake: $ 40.00 | ___ | 0 ___ / ___ | ___ / ___ |
| • Shrink wrap disposal $ 15.00 | ___ | 0 ___ / ___ | ___ / ___ |

Notes: ..........................

..........................
..........................
..........................

Total Labor: ..........
Total Parts/Materials: ..........
Sales Tax on Parts: ..........
Storage: ..........
Gas: ..........
Early Haul out discount: ..........
Total: ..........

PLAINTIFF'S EXHIBIT 13 4/25/03 2066

## STORAGE AGREEMENT AND TERMS

LESSEE agrees to remove the units described above at the termination of this rental agreement. Boats not removed by this date shall, at the option of the LESSOR, be charged rent on a daily basis of $5.00 per day for each day or portion thereof the space is occupied. In the event non-removal of the boat or rig presents a hazard to other persons or property, or interferes with normal business operations, LESSOR shall reserve the right to move the boat or rig to another location AT LESSEE'S RISK and LESSEE AGREES TO PAY ALL COSTS INVOLVED IN THE REMOVAL OF SAID BOAT OR RIG.

LESSEE authorizes LESSOR to remove boat from storage upon termination of this rental agreement and place boat in wet storage solely at LESSEE'S risk.

LESSEE authorizes LESSOR to remove the above described units from storage and transport to _____.

IT IS UNDERSTOOD AND AGREED THAT TRANSPORT OF THE UNITS DESCRIBED SHALL BE ENTIRELY AT THE LESSEE'S RISK.

THIS SPACE LEASE AGREEMENT IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1. INSURANCE: THE LESSOR DOES NOT CARRY INSURANCE COVERING THE PROPERTY OF THE LESSEE. THE LESSOR WILL NOT BE RESPONSIBLE FOR ANY INJURIES OR PROPERTY DAMAGE RESULTING, CAUSED BY, OR GROWING OUT OF THE USE OF THE FACILITIES OF LESSOR AND LESSEE DOES HEREBY RELEASE AND DISCHARGE THE LESSOR FROM ANY AND ALL LIABILITY FROM LOSS, INJURY (INCLUDING DEATH), OR FOR DAMAGES TO PERSON OR PROPERTY SUSTAINED WHILE IN OR ON THE PREMISES OF LESSOR, INCLUDING FIRE, THEFT, VANDALISM, WINDSTORM, HIGH OR LOW WATERS, HAIL, RAIN, ICE, COLLISIONS OR ACCIDENT OR ANY OTHER ACT OF GOD.

2. NON-ASSIGNMENT OF SPACE: It is agreed between LESSOR and LESSEE that LESSEE shall not assign, transfer, or permit the use of assigned space to any other party without the express written consent of LESSOR.

3. ELIMINATION OF HAZARDOUS MATERIALS: Cooking, smoking or the use of any open flame is prohibited inside or outside of the boat while in the storage area. All non-permanent gas tanks, containers of liquid or gaseous fuels, solvents, flares, matches or any other flammable materials must be removed before placement in storage. No combustible or dangerous materials will be allowed to collect in or around the boat at any time. The LESSEE further agrees to keep storage area free and clear of all tackle, gear and other obstructions. FIRE EXTINGUISHERS IN GOOD WORKING ORDER MUST BE ON BOARD.

4. SURVEY AND INSPECTION: The LESSEE authorizes LESSOR to thoroughly survey the boat for fire hazards at hauling or prior to moving to storage. LESSEE understands that this regulation is formulated, enforced and conducted solely for the protection of LESSOR. The promulgation and enforcement of these rules and regulations, the conducting of a survey, the failure to require or fully perform a survey with respect to other LESSEE(S) will not subject LESSOR to any duty or liability to the LESSEE with respect to fire or explosion prevention or detection. In general, any survey will be solely at the discretion of the LESSOR.

5. REMOVAL OF PERSONAL PROPERTY: The LESSEE should remove any personal property from boat prior to storage. IT IS UNDERSTOOD AND AGREED THAT LESSOR WILL NOT BE RESPONSIBLE FOR ANY ITEMS OR PERSONAL PROPERTY LEFT IN BOAT.

6. PROTECTIVE COVERING: The LESSEE assumes full responsibility for providing adequate covering to protect boat from any and all perils, and for the proper maintenance of such covering while the boat is on or in the premises of LESSOR.

7. ALL SPACE RENTALS ARE PAYABLE IN ADVANCE: It is understood and agreed that no boat is to be removed from its space unless all charges for space rental and/or late charges have been paid in full.

8. If LESSEE becomes delinquent in rental payments, the LESSEE being properly notified of such delinquency as may be required by law, the LESSOR shall have the right to take over the property of the LESSEE and to secure the property to the space occupied, or store it at another location.

LESSEE AGREES THAT IN THE EVENT SUIT IS BROUGHT ON BEHALF OF THE LESSOR AGAINST THE LESSEE TO COLLECT ANY AMOUNTS DUE OR TO BECOME DUE THEREUNDER, OR TO ENFORCE LESSOR'S LIEN ON THE PROPERTY OF LESSEE, THE LESSEE SHALL PAY THE LESSOR'S REASONABLE ATTORNEY FEES FOR SUCH SUIT OR COLLECTION PLUS COSTS, AS PROVIDED BY LAW, OR TO TAKE ANY OTHER REMEDIES AVAILABLE UNDER THE LAW.

9. Should any term or condition of this Space Rental Agreement be held void or unenforceable, then that term shall be deemed severed from this Agreement and the enforceability of the remainder shall not be affected and will remain in full force and effect.

10. RULES AND REGULATIONS: The rules and regulations contained herein and as posted in the office or on the grounds by LESSOR are for the safety and welfare of all who use the facilities. It is further understood and agreed that at all times while the boat is stored, the LESSEE and/or their guests shall become subject to all rules and regulations formulated by LESSOR. LESSEE agrees that all duly posted rules and regulations are reasonable, that LESSEE has read and understands said rules and regulations, and further assumes the responsibility to see that his guests will obey the rules.

11. Any infraction of the rules and regulations contained herein or as posted in the office shall, at the option of the LESSOR, cancel this space rental agreement upon proper notice to LESSEE, and the LESSEE shall remove his boat or rig from the premises.

12. The LESSOR shall not be held responsible for delays in hauling, winter layup, commissioning or launching due to bad weather or for any other reasons beyond its control.

13. ENTIRE AGREEMENT: This agreement contains the entire understanding between the LESSEE and LESSOR and no other representation or inducement, verbal or written, has been made which not contained in this agreement.

SPECIAL TERMS AND CONDITIONS (if any) _____

_____

IT IS AGREED THAT THIS CONTRACT IS PERFORMABLE AND VENUE SHALL BE IN FAIRFIELD COUNTY, STATE OF CONNECTICUT. ALL NOTICES REQUIRED BY THIS LEASE OR AT LAW SHALL BE TO THE ADDRESSES STATED HEREIN.

LESSEE'S CERTIFY THAT THE PRINTED MATTER ON BOTH FRONT AND BACK OF THIS AGREEMENT HAS BEEN READ AND THE TERMS AND CONDITIONS SET FORTH HEREIN ARE FULLY UNDERSTOOD. LESSEE(S) FURTHER CERTIFY THAT THEY HAVE EXAMINED THE SPACE IN WHICH THE SUBJECT BOAT IS TO BE PLACED AND FIND IT SUITABLE AND ACCEPTABLE.

I (WE) ACKNOWLEDGE A COPY OF THIS AGREEMENT.

Lessor: Echo Bay Marina  By: _Mary_____

Lessee: _____

# EXCERPTS FROM THE DEPOSITION TRANSCRIPT OF MARK VOELTZ

15

Mark Voeltz

2      Q.   How about Jessica - did she own a
3  boat?

4      A.   No.

5      Q.   Did she own like a personal
6  watercraft?

7      A.   A jet ski.  Mike did.

8      Q.   And, on that occasion where you
9  believe you did bring Mike to the premises, did he
10  bring his jet ski on that occasion?

11      A.   Yes.

12      Q.   Was it that time in the boating season
13  of the year 2000?

14      A.   Yes.

15      Q.   Was that before June 25th, year 2000?

16      A.   I don't recall.

17      Q.   And, in order to go onto the premises
18  of the Echo Bay Marina as a member, did you need
19  to show a pass or a sticker of some
20  identification?

21      A.   Just a parking pass in your
22  windshield.

23      Q.   Was there someone at the premises of
24  Echo Bay that would check the parking pass, to
25  your knowledge?

02/26/04   15:53 FAX 2033306762-CFD   THE HAYMOND LAW FIRM 03/01/2004   Page 13 of 27 ☑013
Case 3:02-cv-01016-CFD   Document 26   Filed 03/01/2004   Page 13 of 27

16

1                          Mark Voeltz

2              A.    Yes.

3              Q.    Who was that?

4              A.    An employee.

5              Q.    Was it like a teenager, seasonal

6         employee?

7              A.    I would assume so.

8              Q.    Was there a designated place to park

9         your vehicle for the Echo Bay Marina?

10             A.    In their lot on their property, yeah.

11             Q.    Okay.  Now, was there a ramp to launch

12        boats?

13             A.    Yes.

14             Q.    Let's talk about the boating season in

15        the year 2000.  Was there anybody, to your

16        knowledge, stationed at the ramp who would check

17        to be sure that anybody using the ramp was an Echo

18        Bay Marina member?

19             A.    Not at the ramp.  The person would be

20        at the beginning of the parking lot when you come

21        in, usually, sitting in a lawn chair there, would

22        check you as you come in.

23             Q.    Were there any provisions that you

24        were aware of as a member to bring a guest to the

25        premises?

17

1                          Mark Voeltz

2              A.    No.

3              Q.    No, there weren't any provisions?

4              A.    No provisions that I know of.

5              Q.    In other words, if you brought a guest

6    to the Echo Bay Marina - now I'm speaking back in

7    the 2000 boating season - did you have to pay a

8    fee for that guest to use the premises?

9              A.    No.

10             Q.    On that occasion when you went with

11   Mike D'Antone to the premises before June 25th,

12   how did he transport his jet ski to the premises?

13             A.    I towed it with my vehicle.

14             Q.    And what kind of vehicle was that?

15             A.    At that time, was -- I don't know.  I

16   change vehicles quite often.

17             Q.    Okay.  A truck?

18             A.    It was a truck, definitely, a truck.

19             Q.    Pickup truck?

20             A.    It was either a Ford pickup or a Chevy

21   Tahoe, one or the other.

22             Q.    This parking pass that you spoke about

23   - was it a card that you could move from car to

24   car or affixed to the window?

25             A.    No.  It was affixed to the window.

02/26/04 15:54 FAX 2033306762    THE HAYMOND LAW FIRM    ☐015
Case 3:02-cv-01016-CFD    Document 26    Filed 03/01/2004    Page 15 of 27

24

Mark Voeltz

1

2      A.    I might have been standing there

3   watching or if I was driving, backing it in.

4      Q.    All right.  In that area where the jet

5   ski was launched, were there any signs indicating

6   no trespassing?

7      A.    No.

8      Q.    Were there any signs indicating

9   members only?

10      A.    No.  Well, the only sign that I could

11   recall is Parking For Echo Bay Members Only.

12      Q.    Parking where?

13      A.    In the lot.  You know, in order to get

14   to the ramp, you have to drive through the parking

15   lot to get to the ramp, and, from what I recall,

16   right at the beginning of the lot, there's a sign

17   that says Parking For Echo Bay Members Only.

18      Q.    Okay.  Did you have any understanding

19   as to whether the launching area was, exclusively,

20   for Echo Bay Marina members?

21      A.    No.

22            MR. LOVEJOY:  Objection.

23            THE WITNESS:  No.

24      Q.    Was there any attendant from Echo Bay

25   Marina monitoring the use of the launching area to

1                        Mark Voeltz

2      make sure only Echo Bay Marina members would use

3      the launching area?

4           A.   No.

5                MR. LOVEJOY:   Objection.

6           Q.   At the time the jet ski was being

7      launched, do you have any memory of what Victor

8      was doing?

9           A.   Victor was, from what I recall, in the

10     in the water.

11          Q.   Okay.  He was assisting?

12          A.   Yeah, getting the jet ski off the

13     trailer, floating it off and bringing it over to

14     the dock to tie it up.  Oh, wait a minute.  Was he

15     in the water?  No.  He was either in one or two

16     places.  He was either on the dock tying the jet

17     ski or in the water.  I would assume - I would

18     think Victor was on the dock.  Yes, he was on the

19     dock waiting for Mike to float the jet ski over to

20     him so he could tie it up so we could go out.

21          Q.   Did you see what happened to Victor

22     that day?  Were you an actual eyewitness to what

23     happened to Victor that day?

24          A.   No.

25          Q.   Okay.  After the jet ski was in the

27

Mark Voeltz

1

2      Q.   Do you have a specific memory of some

3  person from Echo Bay checking to be sure that the

4  vehicle had a parking pass on it?

5      A.   Just -- no, I don't have --

6      Q.   All right.  And when, for the first

7  time, did you learn that something had happened to

8  Victor?

9      A.   Probably, right immediately after it

10  happened.

11      Q.   Okay.  Did you actually go into the

12  marina to find your wife and your son?

13           (Proceedings interrupted.)

14           THE WITNESS:  Excuse me.  I have to

15           answer this.

16           MR. KEYES:  Sure.

17           (Last question read.)

18           THE WITNESS:  I don't know if I

19           made it to the marina.  I might have

20           went up and was coming back.

21      Q.   Okay.  When you came back, was Victor

22  on the ground or something else?

23      A.   Victor was on the ground by -- on the

24  ramp half in the water laying, half out of the

25  water laying.

54

Mark Voeltz

1

2          A.   No.

3          Q.   -- this friend's jet ski; did you?

4          A.   No.

5          Q.   And, when you got there on the 25th of

6    June, was there anybody else launching boats or

7    anything at this ramp?

8          A.   I don't recall.  People launch boats

9    all the time there, jet skis.  You know, I don't

10   really pay attention to it.

11         Q.   Well, on this day in particular,

12   anybody launch anything that you saw?

13         A.   I'm trying to think.  I think I had to

14   wait for somebody to get out of the way.  I don't

15   know for sure.  I'm thinking I had to wait for

16   somebody or we had to wait for somebody to clear

17   the ramp with their trailer before we went in.

18   I'm not 100 percent sure.

19         Q.   If I understand you, correctly, you

20   rent a slip?

21         A.   Yes.

22         Q.   This isn't a marina where you rent

23   something, you launch a boat every weekend; is it?

24              MR. KEYES:  I will object.  Are you

25         asking him a hypothetical question about

55

```
 1                        Mark Voeltz
 2           the policies of the marina or are you
 3           asking what he did?
 4                MR. LOVEJOY:  No.  I'm asking what
 5           he paid for it.
 6                MR. KEYES:  You've asked him that.
 7                MR. LOVEJOY:  I will ask him again.
 8                MR. KEYES:  No.  One answer per
 9           question is fine.
10                THE WITNESS:  Go ahead.  I'm sorry.
11           Q.   I mean your contract was for keeping a
12     boat at a slip?
13           A.   Yes.
14           Q.   And it allowed you to launch the boat
15     and take it out at the end of the season; is that
16     correct?
17                MR. KEYES:  I will object to the
18           form of the question.
19                THE WITNESS:  I have used the ramp
20           on several occasions throughout the
21           season.
22           Q.   To take your boat in and out?
23           A.   Uh-huh.
24                MR. KEYES:  Yes?
25                THE WITNESS:  Yes.
```

02/26/04 15:55 FAX 2033308762 THE HAYMOND LAW FIRM Ø020
Case 3:02-cv-01016-CFD Document 26 Filed 03/01/2004 Page 20 of 27

74

Mark Voeltz

have a smooth piece of wood there in the water,

make a slick surface.

    Q.   And who did you make that comment to?

    A.   The people gathering around where

Victor was laying and, probably, one of the owners

of the marina.

    Q.   And did the owner of the marina come

over and observe Mr. Chacon?

    A.   I think so.

    Q.   Who was that, to your knowledge?

    A.   I don't know.  I can't put names with

faces up there.

    Q.   Now, you've mentioned before you had

used the ramp to launch your boat on occasions

before June 25th?

    A.   Yes.

    MR. LOVEJOY:  Objection.

    Q.   Had anybody at the marina ever come

over to stop you from using the ramp to launch

your boat?

    A.   No.

    MR. KEYES:  That's all I have.

EXAMINATION BY

MR. LOVEJOY:

# EXCERPTS FROM THE DEPOSITION TRANSCRIPT OF MARC ROGG

25

```
1    facility?
2        A    No.
3        Q    Do you recognize the name Mark Voeltz?
4        A    Yes.
5        Q    How do you recognize that name?
6        A    He was a slip customer.
7        Q    When did he first become a slip customer?
8        A    I'm not sure.
9        Q    How long was he a slip customer?
10       A    Three years I believe.
11       Q    From what years to what years?
12       A    It was either '97 through 2000 or '98
13   through 2000.
14       Q    Do you recall what kind of boat he had?
15       A    Twenty-five foot chaparral.
16       Q    Do you recall the name?
17       A    It had pink stripes.  It will come to me.  I
18   don't recall the name.
19       Q    Did all your customers have a written
20   contract for slip rentals?
21       A    Yes.
22       Q    In other words, you needed a written
23   contract for each season that you rented a slip?
24       A    Yes.
25       Q    Did the contract change from year to year?
```

SELIGSON REPORTING (203) 799-2016

26

```
1    I mean, other than the dates and obvious stuff, but did
2    the contents of the contract change in any significant
3    way from year to year?
4        A    No.
5        Q    Did you have slip members who also own jet
6    skis?
7        A    Yes.
8        Q    Was there any provision for accommodating a
9    slip member's desire to use a jet ski on a weekend?
10       A    We have jet ski -- you can buy a slip for
11   your jet ski at the marina if you would like.  Five
12   hundred dollars per season.
13       Q    What was the purpose of the launching ramp
14   if it couldn't be used on the weekends and the
15   holidays?
16       A    The lake freezes and in the winter you have
17   to take the boats out of the water so that is the
18   access to get the boats in the water and out of the
19   water.
20       Q    There's no lift or other device to place
21   boats in the water at Echo Bay Marina?
22       A    No.
23       Q    The launching ramp area would be the only
24   area used to launch boats at the beginning of the
25   season and retrieve them at the end of the season;
```

SELIGSON REPORTING (203) 799-2016

27

```
1    correct?
2        A    Correct.
3        Q    During the boating season did you have
4    members who would take out their boats during the
5    boating season and take them to other waterways?
6        A    Yes.
7        Q    Was there any restriction on the number of
8    times that a particular slip member could retrieve his
9    boat using the launching ramp during the boating
10   season?
11       A    No.
12       Q    Would a slip member have to make any
13   particular arrangement to use the launching ramp area
14   to retrieve his boat during the boating season?
15       A    Just follow within the guidelines, time
16   guidelines; before 8:00 p.m. in the evening and
17   weekdays only.
18       Q    Any restriction in the morning?
19       A    No.
20       Q    They didn't need your permission to do that,
21   did they?
22       A    No.
23       Q    They didn't need anybody on behalf of Echo
24   Bay Marina's permission to use a launching ramp as long
25   as it wasn't a weekend or a holiday; is that correct?
```

SELIGSON REPORTING (203) 799-2016

28

```
1            MR. LOVEJOY:  Objection.  Are you saying to
2        launch the boat that they paid for a slip for,
3        because it started out that way and now we're only
4        talking about the ramp and I don't want him to get
5        tricked.
6        Q    I'm asking questions about the launching
7    ramp.  If a customer, if a slip customer wanted to use
8    the launching ramp did he have to request permission or
9    receive permission on behalf of anybody from Echo Bay
10   Marina to do so?
11           MR. LOVEJOY:  I object.  To launch what,
12       Mr. Keyes?
13           MR. KEYES:  A boat.
14           MR. LOVEJOY:  The boat he paid a slip rental
15       for or some other?
16       Q    We'll start out with -- Thank you.  We'll
17   start out with the boat he paid slip a rental for?
18       A    Did not.
19       Q    Let's say he wanted to launch another boat
20   other than what he paid the slip rental for?
21       A    Take it to the state boat ramp.
22       Q    My question is:  If a slip member wanted to
23   launch a boat other than the one for which he had paid
24   the slip rental fee for would he need permission from
25   anybody at the Echo Bay Marina to do so?
```

SELIGSON REPORTING (203) 799-2016

29

```
1       A    Yes.
2       Q    How is that information communicated to the
3   slip owners?
4       A    Via --
5       Q    Well, you're reviewing something. Before
6   you review something can you answer the question.
7       A    I don't know how that was communicated.
8       MR. KEYES: Now, give me that document you
9   were referring to we're going to mark it. Let's
10  use numbers. Do you want to continue on?
11      MR. LOVEJOY: That's fine as long as we
12  agree to put his name on the sticker also.
13      MR. KEYES: I think it's Plaintiff's 7.
14  Yes, it is.
15      (Plaintiff's Exhibit 7, marked for
16  identification.)
17      THE WITNESS: Can we go back to the last
18  question.
19      MR. KEYES: Sure.
20      THE WITNESS: The slip contract was for a
21  specific boat which was listed on there. So that
22  is the boat that the customer has the contract
23  for.
24      Q    When Echo Bay Marina was first formed were
25  you the general manager at that time?
```

SELIGSON REPORTING (203) 799-2016

30

```
1       A    Yes.
2       Q    From December of '93 up until June 25th of
3   2000 you were the general manager of the facility?
4       A    Yes.
5       Q    Had there been occasions during that
6   interval where you had directed persons not to use the
7   launching ramp area?
8       A    Run that by me once more.
9       Q    She'll read that back.
10      (Question read.)
11      A    Yes.
12      Q    Could you tell me how frequently that
13  happened?
14      A    Once a month, estimating.
15      Q    Had there been an occasion prior to June
16  25th 2000 that you directed Mark Voeltz not to use the
17  launching ramp?
18      A    I do not recall.
19      Q    Let me show you a document that's been
20  marked for identification as Plaintiff's Exhibit 7,
21  could you just tell me what that is?
22      A    A slip contract.
23      Q    Is it a slip contract for a particular
24  member?
25      A    Mark Voeltz.
```

SELIGSON REPORTING (203) 799-2016

31

```
1       Q    Was this contract in effect as of June 25th
2   in the year 2000?
3       A    Yes.
4       MR. KEYES: Mr. Lovejoy, I just want to be
5   clear, you had made representations to me
6   previously and at the last deposition and
7   throughout the discovery of this case that the
8   contract pertaining to Marc Voeltz didn't exist.
9   Do you want to change those representations?
10      MR. LOVEJOY: Mr. Keyes, if you're trying to
11  set me up I don't appreciate it. I have a copy of
12  a contract that I was told was -- doesn't have
13  anybody's name on it. So apparently there was a
14  miscommunication or something.
15      MR. KEYES: Thank you.
16      Q    The writing that appears on this contract,
17  the handwriting in blue pen whose hand is that in?
18      A    That would be Margaret Rogg.
19      Q    But the top information and so forth, whose
20  handwriting is that in?
21      A    That would be Margaret Rogg and that's
22  whoever, that's different people -- he was making
23  payments on the slip so whoever.
24      Q    Does that indicate that the payment was in
25  fact made on 6/25 2000?
```

SELIGSON REPORTING (203) 799-2016

32

```
1       A    Yes.
2       Q    How much?
3       A    Five hundred.
4       Q    Where would that payment have been made at
5   the premises?
6       A    In the front store.
7       Q    Mr. Voeltz would have would have had to have
8   walked in the store and make and the payment for the
9   contract; is that correct?
10      A    Yes.
11      Q    Do you know what day of the week 6/25 2000
12  was?
13      A    No.
14      Q    If I told you it was a Sunday, would you
15  have any reason to agree?
16      MR. LOVEJOY: I object. He already
17  testified that he doesn't know?
18      Q    In other words, a business office to receive
19  payments that would have been opened on a weekend; is
20  that correct?
21      A    We're open seven days.
22      Q    Did you charge slip customers an extra
23  amount to store their trailers?
24      A    Yes.
25      Q    If the person stored their trailer at your
```

SELIGSON REPORTING (203) 799-2016

65

```
1.   foot.
2        Q    Who would make a determination that a cone
3    should be placed?
4        A    Me or my employees if they, you know, me.
5        Q    Why was it at the base of D dock that a cone
6    was placed?
7             MR. LOVEJOY:  Asked and answered.
8        Q    Was a portion of D dock submerged when the
9    water levels would go up?
10       A    Yes.
11       Q    Did you think that it was hazardous when a
12   portion of the stairs of D dock were submerged by high
13   water?
14       A    Yes.
15       Q    Did you think it was a hazard that a portion
16   of the ramp would be submerged necessitating the
17   placement of a cone?
18       A    I do not remember having that thought but I
19   would assume if it was underwater, yes.
20       Q    By the nature of the construction of the
21   ramp a portion of it would be under water; isn't that
22   right?
23            MR. LOVEJOY:  Objection.
24       A    No.
25       Q    Take a look at Plaintiff's Exhibit 5, let me
```

SELIGSON REPORTING (203) 799-2016

66

```
1    ask you, do you recognize what's depicted in that
2    photograph?
3        A    Yes.
4        Q    What does that show?
5        A    A ramp.
6        Q    Is that the ramp that leads to the dock
7    we've been discussing that's adjacent to the launch
8    ramp area?
9        A    Yes.
10       Q    A portion of the ramp appears to be
11   submerged?
12       A    Yes.
13       Q    Do you see also there's an orange cone
14   present in the photograph?
15       A    Yes.
16       Q    Does this photograph refresh your
17   recollection as to why an orange cone would be placed
18   in the location that's depicted in the photograph?
19            MR. LOVEJOY:  Objection.  Asked and
20       answered.
21       A    A high water condition must have existed and
22   we decided to put a cone there.
23       Q    Was that because a portion of the ramp would
24   constitute a hazardous condition?
25            MR. LOVEJOY:  Objection.
```

SELIGSON REPORTING (203) 799-2016

67

```
1        A    No.
2        Q    What was your point in placing the cone?
3        A    Caution.
4        Q    This condition that's depicted in
5    Plaintiff's Exhibit 5 involving the ramp, how
6    frequently would a portion of the ramp be submerged?
7        A    Infrequently.  Water level is very high
8    there, abnormally high.
9        Q    How infrequent is your use of the word
10   infrequent?  How's that for a question?
11            MR. LOVEJOY:  He doesn't use the word very
12       often.
13       Q    I'll withdraw the question.  The condition
14   that's depicted in Plaintiff's Exhibit 5 how often
15   during a boating season would that condition exist?
16       A    It varies year by year.
17       Q    Give me a range if you can.
18       A    Every five years potentially, two to three
19   weeks per five years.
20       Q    In other words the condition would exist for
21   a continuous period of two to three weeks; is that
22   right?
23       A    Yes.
24       Q    Do you have any knowledge as to what would
25   cause the level of the lake to return to what's
```

SELIGSON REPORTING (203) 799-2016

68

```
1    presumed to be a normal height?
2        A    The dam would be opened by the power
3    company.
4        Q    Would the power company advise you when they
5    were going to change the level of water?
6        A    Unfortunately, no.
7        Q    Before you mentioned that you advertised in
8    the Yellow Pages, which Yellow Pages was that?
9        A    Danbury, Litchfield Hills, I believe it's
10   called.
11       Q    If a slip owner brought a guest to the
12   premises would he have to register that guest?
13       A    No.
14       Q    When did you first learn of an accident
15   involving Mr. Chacon?
16       A    You know, within fifteen minutes, you know,
17   ten to fifteen minutes of the occurrence.
18       Q    How did you learn of it?
19       A    Someone notified the front office.
20       Q    Who was that someone?
21       A    Do not know.
22       Q    Was it an employee of Echo Bay Marina?
23       A    Do not know.
24       Q    Where were you when you learned of the
25   occurrence?
```

SELIGSON REPORTING (203) 799-2016

# EXCERPTS FROM THE DEPOSITION TRANSCRIPT OF
# MICHAEL D'ANTONA

02/26/04  15:57 FAX 2033306762     THE HAYMOND LAW FIRM                      ☒026
Case 3:02-cv-01016-CFD     Document 26     Filed 03/01/2004     Page 26 of 27

20

1          Q     You had to follow Mark?

2          A     I had to follow Mark to get there.

3          Q     And, when you arrived at Echo Bay, where did

4     you put the vehicle?

5          A     We pulled to the side of the road.

6          Q     And was that roughly across from the area

7     which appeared to be the launching area?

8          A     This was the boat.  I guess the launching area

9     was over here.

10          Q     To the left?

11          A     To the left, yes.

12          Q     Did you see anybody from Echo Bay Marina in or

13     around the launching area?

14          A     No -- Did I?   No.

15          Q     Was there any attendant there in the launching

16     area to check passes or anything like that?

17                    MR. LOVEJOY:  Objection.

18          A     No.

19          Q     Did you have to ask somebody to use the

20     launching area?

21          A     Did I?  No.

22          Q     Did you see other vehicles and trailers using

23     the launching area before you used the launching area

24     that day?

25          A     Yes, I did see somebody else.

02/26/04  15:57 FAX 2033306762     THE HAYMOND LAW FIRM                    ☑027
Case 3:02-cv-01016-CFD     Document 26     Filed 03/01/2004     Page 27 of 27

21

1        Q     Were they launching a boat or a jet ski or

2    something else?

3        A     Boat.

4        Q     How was it decided that Vic would launch the

5    jet ski?

6        A     I just always more of a panic going into the

7    water.  So he always did it.

8        Q     Was he better at backing up the trailer than

9    you were?

10       A     It was more that he was just more experienced

11   in taking off a jet ski.  So that's why he usually

12   did it.

13       Q     And, where was Mandy and -- Jessica, his wife,

14   right?

15       A     Yes.

16       Q     Where were Mandy and Jessica at the time the

17   jet ski was being launched?

18       A     I don't know.  I couldn't tell you.

19       Q     In any event, they weren't up with you in the

20   marina building, were they?

21       A     No.  No.

22       Q     And, I take it, Mark had left the marina

23   building before you did, is that correct?

24       A     Yes.

25       Q     Did he have a tube with him that had been